1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   FREDERICK STOCCO, an individual,
KATHLEEN STOCCO, an individual,
12   and GIA FLORENCE SRL, an Italy
company,

CASE NO. 12-CV-1291 WQH
(DHB)

**ORDER**

13
                                  Plaintiffs,
14         vs.

15   GEMOLOGICAL INSTITUTE OF
AMERICA, INC., a California
16   Corporation; and Does 1 through 100,

17                                  Defendant.

18   HAYES, Judge:

19         The matter before the Court is the Motion for Summary Judgment (ECF No. 46)

20   filed by Defendant Gemological Institute of America, Inc.

21   **I.  Background**

22         On April 19, 2012, Plaintiffs Frederick Stocco and Kathleen Stocco filed a

23   complaint in San Diego Superior Court against Defendant Gemological Institute of

24   America ("GIA").  (ECF No. 1).  On May 29, 2012, Defendant removed the action to

25   this Court on the basis of federal question jurisdiction. (ECF No. 1-3).  On July 10,

26   2012, Plaintiffs filed the First Amended Complaint ("FAC").  (ECF No. 7).  The FAC

27   asserted the following claims for relief: (1) fraud - misrepresentation; (2) negligence,

28   (3) breach of written contract; (4) fraud in the inducement; (5) failure to provide

franchise offering circular; and (6) unfair business practices.   On July 20, 2012, Defendant filed a motion to dismiss the FAC.  (ECF No. 10).  On January 3, 2013, the Court granted the motion to dismiss, dismissing Plaintiffs' third, fourth, fifth, and sixth claims for breach of written contract, fraud in the inducement, failure to provide franchise offering circular, and unfair business practices, respectively.  (ECF No. 14).

On May 28, 2013, Plaintiffs filed the Second Amended Complaint ("SAC"), which is the operative pleading, adding GIA Florence SRL (hereinafter "GIA Italy") as a Plaintiff.  (ECF No. 29).  The SAC asserts the following claims for relief against Defendant GIA: (1) fraud - misrepresentation by Frederick and Kathleen Stocco; (2) negligence by Frederick and Kathleen Stocco; (3) breach of written contract by GIA Italy; and (4) failure to provide franchise offering circular by all Plaintiffs.  On June 7, 2013, Defendant filed a motion to dismiss the SAC.  (ECF No. 33).  On September 24, 2013, the Court issued an order granting in part Defendant's motion to dismiss, dismissing Plaintiffs' fourth claim for failure to provide franchise offering circular.  (ECF No. 37).  On October 8, 2013, Defendant filed an Answer and Counterclaims to the SAC.  (ECF No. 38).

On July 30, 2014, Defendant filed the Motion for Summary Judgment.  (ECF No. 46).  On August 20, 2014, Plaintiffs filed an opposition.  (ECF No. 47).  On August 25, 2014, Plaintiffs filed an amended opposition.  (ECF No. 48).  On August 29, 2014, Defendant filed a reply and objections to Plaintiffs' evidence in opposition.  (ECF Nos. 51-52).  On October 29, 2014, the Court held oral argument on the Motion for Summary Judgment.

On November 7, 2014, the Court issued an Order requesting supplemental briefing on three issues.  (ECF No. 62).  On November 20, 2014, Plaintiffs filed a supplemental brief.  (ECF No. 63).  On December 1, 2014, Defendant filed a response to Plaintiffs' supplemental brief.  (ECF No. 64).  On December 8, 2014, Plaintiffs filed a reply in support of their supplemental brief.  (ECF No. 67).

## II.  Factual Background

### A.  The Stoccos' Social Security Benefits

In 1991, GIA-GEM, a subsidiary of GIA, hired Plaintiffs Frederick and Kathleen Stocco (together, the "Stoccos") to work in Italy.  (Plaintiffs' Response to Defendant's Separate Statement of Undisputed Material Facts ("Pls.' RSSUF") ¶ 3, ECF No. 48-2 at 2).  The Stoccos were hired pursuant to two separate employment agreements.  *Id.* ¶ 5.  The employment agreements, entered into between the Stoccos and GIA, covered a period from December 10, 1991, to December 15, 1993, and "assign[] [the Stoccos] for services in Vicenza, Italy."  (SAC Ex. 1, at 3-4, ECF No. 29-2 at 3-4).  The employment agreements list Frederick Stocco's base salary at $50,000 and Kathleen Stocco's base salary at $30,000.  *Id.*  The employment agreements do not cover or refer to U.S. Social Security benefits or promise to file a "certificate of coverage."  (Pls.' RSSUF ¶ 9, ECF No. 48-2 at 3-4).

According to Frederick Stocco, Dennis Foltz,[1] a GIA representative (now deceased), hired him and told him at the time of his hiring in 1991 that GIA would file a "certificate of coverage" that would enable the Stoccos to participate in the U.S. Social Security System, even though they would be working abroad in Italy.  *Id.* ¶ 6; (F. Stocco Dep. at 25:25-28:11, 54:2-23, ECF No. 46-4 at 5-8, 30).  Frederick Stocco testified that Dennis Foltz told him that he "wouldn't have to pay into [Italy's] Social Security" and that he "was remaining in the U.S. Social Security system" by virtue of the filing of the "certificate of coverage."  *Id.* at 54:15-23.  Kathleen Stocco testified that she never had a conversation with anybody at GIA about a "certificate of coverage," but testified that Chris Kennan, a "colleague" and head of GIA Bangkok, told her that "[y]ou get paid like [you have] always been paid."  (K. Stocco Dep. at 86:6-15, 87:1-4, ECF No. 46-5 at 39-40).

---

[1] It is undisputed that Foltz was a GIA "representative" at the time he made the representation, and Frederick Stocco testified that Dennis Foltz was Defendant GIA's vice president of education at that time.  (Pls.' RSSUF ¶ 6, ECF No. 48-2 at 3; F. Stocco Dep. at 26:21-22, ECF No. 46-4 at 6).

"In December 1991, pursuant to their employment agreements, the Stoccos relocated from the U.S. to Vicenza, Italy."  (Pls.' RSSUF ¶ 10, ECF No. 48-2 at 4). "Up until April 1992 ... the Stoccos were paid directly by GIA, and were provided paystubs, which showed deductions for U.S. Social Security taxes." *Id.* ¶ 17.

In 1992, GIA established GIA Italy, a wholly-owned subsidiary, for the purpose of opening a school for gemological studies in Vicenza, Italy. *Id.* ¶¶ 1, 11. Frederick and Kathleen Stocco became Managing Directors of the school. *Id.* ¶ 12. Kathleen Stocco "ran GIA Italy's day-to-day operations." *Id.* Frederick Stocco assisted Kathleen Stocco, acted as an interface for the school with local trade, and interviewed potential students. *Id.* ¶ 13.  "After April 1992, [when the school became operational,] the Stoccos received wages from only one entity – GIA Italy.  The Stoccos did not receive any compensation from any source other than GIA Italy." *Id.* ¶ 20.

Kathleen Stocco testified that she was responsible for paying GIA Italy's bills and issuing employee paychecks and pay stubs, and that she was ultimately responsible for GIA Italy's payroll. (K. Stocco Dep. at 29:4-8, 60:10-61:6, ECF No. 46-5 at 13, 28-29).  At one point, Kathleen Stocco testified that GIA did not request copies of wage statements or invoices paid by GIA Italy. *Id.* at 27:19-28:4.  At another point, Kathleen Stocco testified that "all of the financials were reported to the U.S.  So the U.S. would receive all of this information, and then make the payments in the U.S.  But Italy would have nothing to do with that." (K. Stocco Dep. at 77:16-20; ECF No. 48-6 at 16). Frederick Stocco testified that Italian CPAs prepared GIA Italy's employee paychecks and wage statements, including the Stoccos' paychecks.  (F. Stocco Dep. at 35:2-13, ECF No. 46-4 at 13).  Frederick Stocco testified that either he or Kathleen Stocco would sign the paychecks and view the wage statements. *Id.* at 35:13-37:23.  Frederick Stocco also testified that Italian CPAs prepared these documents because this process is "very complicated" in Italy. *Id.* at 36:23-37:9.

Kathleen Stocco testified that she was responsible for making payments on behalf of GIA Italy into the Italian social insurance system and that GIA Italy wage statements

would show deductions for Italian social insurance taxes. (K. Stocco Dep. at 61:21-62:8, ECF No. 46-5 at 29-30). It is undisputed that from 1996-2011, "GIA Italy (and later GIA Florence) contributed to the Italian social insurance system on behalf of the Stoccos. The statements indicate that the Stoccos also contributed to their respective [Istituto Nazionale della Previdenza Social ("INPS")] Accounts."[2] (Pls.' RSSUF ¶ 25, ECF No. 48-2 at 8; *see also* Exhibit 6 to the Declaration of Nancy Dix ("Dix Decl."), ECF No. 46-9; Exhibits 1-3 to the Declaration of Emiliana Dal Bon ("Dal Bon Decl."), ECF Nos. 46-24, 46-25, 46-26). Emiliana Maria Dal Bon, an Italian labor consultant, stated that, based on the Stoccos' INPS Statements, the Stoccos were contributing to the Italian social insurance system. (Dal Bon Decl. ¶¶ 10-12, ECF No. 46-23 at 3). Dal Bon stated that, "[l]ike the U.S. Social Security System, workers and employers in the Italian Social insurance system both contribute into the system on the worker's behalf." *Id.* ¶ 8.

> Once the worker has contributed to the system for a certain number of years, which is determined in part by the category of the worker, the worker becomes vested in the system. The worker is then able to collect the benefits upon reaching a certain age, which is also determined in part on the category of the worker. Benefits are determined based on the number of years social contributions were paid into the system on the worker's behalf.

*Id.* Dal Bon concluded: "Having reviewed the Stoccos' INPS Statements of Account Contributions, I can confirm, based on my expertise, that both of the Stoccos are entitled to receive retirement benefits through the Italian Social Insurance System." *Id.* ¶ 12.

Kathleen Stocco testified that GIA Italy never issued a payment to the U.S. Social Security system. (K. Stocco Dep. at 81:4-14, ECF No. 46-5 at 38). Kathleen Stocco testified that she never saw U.S. Social Security tax deductions on her own paychecks or wage statements from 1993 until 2007. (K. Stocco Dep. at 79:7-13, ECF No. 48-6

---

[2] Emiliana Maria Dal Bon, an Italian labor consultant, stated that the INPS is "an agency of the Italian federal government responsible for implementing Italy's social insurance [s]ystem consisting of retirement, disability, and survivors' benefits." (Declaration of Emiliana Dal Bon ("Dal Bon Decl.") ¶ 6, ECF No. 46-23 at 2-3).

at 18).  Kathleen Stocco testified that U.S. Social Security tax deductions "would not be recorded in Italy" because "all of the financials were reported to the U.S.  So the U.S. would receive all of this information, and then make the payments in the U.S.  But Italy would have nothing to do with that."  (K. Stocco Dep. at 76:8-9, ECF No. 46-5 at 35; K. Stocco Dep. at 77:16-20, ECF No. 48-6 at 16).  Frederick Stocco testified that he did not see any indication on his wage statements after April of 1992 that U.S. Social Security taxes were being deducted from his wages.  (F. Stocco Dep. at 39:24-40:5, ECF No. 46-4 at 16-17).

In 2007, GIA transferred ownership of GIA Italy to the Stoccos through a stock transfer agreement and licensing agreement ("2007 Licensing Agreement").  (Pls.' RSSUF ¶ 35, ECF No. 48-2 at 10).  The 2007 Licensing Agreement permitted the Stoccos to use GIA's intellectual property and continue operating the gemology school. *Id*.

Frederick Stocco testified that he first discovered, in 2011, that GIA had not made Social Security contributions on his behalf any time after 1992.  (F. Stocco Dep. at 50:4-7, ECF No. 46-4 at 27).  Frederick Stocco testified that, in 2011, a Social Security Administration employee informed him that GIA had not made Social Security contributions for him after 1992, the same year GIA Italy was established.  *Id.* at 50:9-20.

In 2012, Frederick Stocco began collecting 597 Euros per month from the Italian social insurance system.  (Pls.' RSSUF ¶ 28, ECF No. 48-2 at 9).  Kathleen Stocco will be eligible for Italian social insurance benefits when she turns 71.  *Id.* ¶ 30.  Frederick Stocco has received some U.S. Social Security benefits, and Kathleen Stocco is eligible to receive U.S. Social Security benefits.  *Id.* ¶¶ 27, 29.

**B.  The Firgem Foundation and Drop-Off Window**

In 2005, GIA relocated GIA Italy from Vicenza to Florence.  *Id.* ¶ 31.  At this same time, GIA, the Florence Chamber of Commerce, and the University of Florence incorporated the Firenze Scienze Gemmologiche ("Firgem Foundation").  *Id.* ¶ 32.  The

Firgem Foundation was formed by Articles of Incorporation ("Firgem Agreement"), which state that its purpose is to "exclusively pursue[] goals that encourage and support the creation of a multi-purpose center to promote study and research in the field of gemology" and "to promote training, study and research in the field of gold jewelry design and production." *Id.* ¶ 33.  The Firgem Articles state that the Firgem Foundation is founded "[b]y the initiative of" GIA, the University of Florence, and the Florence Chamber of Commerce.  (SAC Ex. 4 at 103, ECF No. 29-2 at 103). The Firgem Agreement provides that the Foundation is "delegating to [GIA Italy] the operational part of the activities and providing the premises of the Foundation to the above as a 'free of charge loan for use.'"[3]  *Id.* at 105.  The Firgem Agreement provides that GIA Italy "will carry out independently" certain activities, including "[p]erforming the analysis of precious stones and metals, [and] issuing globally recognized GIA Carlsbad certificates...."  (ECF No. 29-2 at 105).  GIA President William Boyajian appointed Frederick Stocco as his proxy to sign the Firgem Agreement on behalf of GIA.  (Exhibit 13 to the Declaration of Dennis Hickman ("Hickman Decl."),  ECF No. 48-17).

In 2007, GIA transferred ownership of GIA Italy to the Stoccos through the 2007 Licensing Agreement.  (Pls.' RSSUF ¶ 35, ECF No. 48-2 at 10).  The 2007 Licensing Agreement permitted the Stoccos to use GIA's intellectual property and continue operating the gemology school.  *Id.*  In 2009, GIA and GIA Italy entered into an new licensing agreement that replaced the 2007 licencing agreement ("2009 Licensing Agreement").  *Id.* ¶ 36.  Both licensing agreements provided that GIA Italy "will not operate any trade-service laboratory for the purpose of diamond grading, colored stone grading, or gem identification, without the prior written consent of GIA in each instance."  (SAC Ex. 6 at 159, ECF No. 29-3 at 7; SAC Ex. 7 at 211, ECF No. 29-4 at 6).

---

[3] GIA Italy was a wholly-owned subsidary of GIA in 2005.  It is undisputed that Defendant GIA established GIA Italy under Italian law as a "wholly-owned subsidiary" in or around February 1992, and that Defendant GIA transferred ownership of GIA Italy to the Stoccos in 2007.  (Pls.' RSSUF ¶¶ 11, 35, ECF No. 48-2 at 4, 10).

In a letter dated May 10, 2007, Donna M. Baker, as GIA's president, appointed the Stoccos as Council Members of the Firgem Foundation.  (Hickman Decl. Ex. 7, ECF No. 48-11).  In 2008, Baker, as GIA's CEO, wrote a letter on behalf of GIA, resigning from the Firgem Foundation and delegating to GIA Italy "all powers [of GIA] to make any decisions and conclude any agreements relative to the Foundation."  (Pls.' RSSUF ¶ 38, ECF No. 48-2 at 11; SAC Ex. 8 at 269, ECF No. 29-4 at 64).

On March 7, 2011, the Firgem Foundation issued a press release, stating:

> The Florence Chamber of Commerce & Firgem (Fondazione Firenze Scienze Gemmologiche) formally opened their new gem laboratory, Gem Lab Services (GLS), based in the history center of Florence on the prestigious Via Tornabuoni.
> ...
> GLS, a state-of-the-art lab, will offer services for diamond and colored stone grading reports backed by FIRGEM, as well as an impressive drop-off service for internationally recognized GIA (Gemological Institute of America) reports and certificates; the only Italian gem lab to offer this service, and, one of only 3 labs in Europe that offer a GIA drop-off service.

(Dix Decl. Ex. 9, ECF No. 46-12).   In a letter dated March 22, 2011, Donna Baker wrote to Gregory Winegar of the Florence Chamber of Commerce and Firgem, stating:

> It was brought to our notice ... that the press release contained an error by stating GLS will offer a GIA drop-off service, one of three labs in Europe to do so.  Actually, the only such locations in Europe are London and Antwerp.  To prevent consumers from experiencing confusion or making incorrect assumptions, we respectfully request that future press releases do not mention GIA as regards grading services.  We appreciate your understanding in this manner.

(SAC Ex. 9 at 271, ECF No. 29-4 at 66).

Brook Ellis testified that there was some discussion at some point between Defendant GIA and the Firgem Foundation about opening a "take-in window" but not a gem lab.[4]  (Ellis Dep. at 24:7-25:14, ECF No. 48-16 at 3-4).  Frederick Stocco testified that, some time after they acquired ownership of GIA Italy in 2007, the Florence Chamber of Commerce agreed to provide eighty-percent of the revenues from a gem grading lab to fund the school, which formed their expectation of receiving

---

[4] Neither party identifies Brook Ellis.

revenue from a gem grading lab.  (F. Stocco Dep. at 128:4-131:4, 140:18-141:1, ECF No. 46-6 at 35-38, 46-47).   Kathleen Stocco testified that Defendant GIA never authorized GIA Italy to open a "gem lab," "take-in window," or "drop-off window." (K. Stocco Dep. at 111:13-21, ECF No. 48-6 at 30).   Kathleen Stocco testified that her understanding of the Firgem Foundation's purpose was to support GIA education and open up a lab that issued GIA reports.  *Id.* at 111:22-112:6.  Kathleen Stocco testified that GIA Italy expected the Firgem Foundation's gem lab or take-in window to be a source of significant revenue for GIA Italy because "[w]hen you have the access to a GIA report, it draws the trade into that city for business.  And when you draw the trade into the city for business, we have an increase in enrollments and thus revenue."  *Id.* at 129:6-14.

## III.  Motion for Summary Judgment

Defendant moves for summary judgment on Plaintiffs' three remaining claims: (1) negligence; (2) fraud - misrepresentation; and (3) breach of written contract.

### A.  Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that is relevant to an element of a claim or defense, determined by the substantive law governing the claim or defense. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970).  Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."   *Celotex Corp. v. Cartrett*, 477 U.S. 317, 325 (1986); *see also United*

*Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating the nonmoving party's claim.") (quotation omitted).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 256.

## B. Second Claim for Negligence (by the Stoccos)

The Stoccos assert that Defendant GIA was negligent in failing to contribute to their U.S. Social Security accounts from April of 1992 until 2007. The Stoccos assert that Defendant GIA had a legal duty to do so because Dennis Foltz, a GIA vice president (now deceased), represented to the Stoccos at the time of their hiring that GIA would file certificates of coverage on the Stoccos' behalf. According to the Stoccos, Defendant GIA's filing of certificates of coverage would enable them to participate in the U.S. Social Security system while working abroad for GIA from 1992 until 2007, when ownership of GIA Italy was transferred to the Stoccos pursuant to the 2007 Licensing Agreement. Defendant moves for summary judgment on the Stoccos'

negligence claim on three grounds: (1) statute of limitations; (2) lack of a legal duty; and (3) lack of damages.

### i. Statute of Limitations

Defendant contends that any negligence claim is time-barred because the claim accrued in 1992, and the Stoccos should not get the benefit of the discovery rule. Specifically, Defendant contends that the Stoccos should have known that GIA was not making payments to the U.S. Social Security system because GIA Italy's audit reports and statements from Italy's social insurance system both showed that payments were being made to the Italian social insurance system. Defendant contends that the Stoccos themselves made payments to the Italian social insurance agency on GIA Italy's behalf, and that Frederick Stocco knew that the filing of certificates of coverage would exempt the Stoccos from paying into the Italian social insurance system. Defendant further contends that the wage statements the Stoccos received (and helped prepare) did not show any withholdings for U.S. Social Security taxes. Defendant contends that the Stoccos were aware that GIA Italy "never issued a check to the U.S. Social Security Administration for Social Security taxes." (ECF No. 46-1 at 12).

The Stoccos contend that they had no reason to inquire into their U.S. Social Security status until Frederick Stocco turned sixty-five in 2011. The Stoccos contend that a Social Security Administration agent informed Frederick Stocco in 2011 that his account "reflected a drastically reduced amount from that which he expected," and Frederick Stocco began to inquire about payments made by GIA. (ECF No. 48-1 at 15).

In California, actions for personal injury and the breach of an oral contract have two-year statutes of limitations. Cal. Code Civ. Proc. § 335.1; Cal. Code Civ. Proc. § 339. "The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises ....'" *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) (citation omitted). "An exception to the general rule for defining the accrual

of a cause of action—indeed, the 'most important' one—is the discovery rule." *Id.*
(citation omitted).   "It postpones accrual of a cause of action until the plaintiff
discovers, or has reason to discover, the cause of action." *Id.*

"California law recognizes a general, rebuttable presumption, that plaintiffs have
'knowledge of the wrongful cause of an injury.'" *Grisham v. Philip Morris U.S.A., Inc.*,
40 Cal. 4th 623, 638 (2007) (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th
797, 808 (2005)).   "In order to rebut the presumption, a plaintiff must plead facts
sufficient to convince the trial judge that delayed discovery was justified. And when the
case is tried on the merits the plaintiff bears the burden of proof on the discovery issue."
*William L. Lyon & Assocs., Inc. v. Superior Court*, 204 Cal. App. 4th 1294, 1310 (2012)
(quoting *April Enters, Inc. v. KTTV*, 147 Cal. App. 3d 805, 832 (1983)).   A plaintiff
seeking the benefit of the discovery rule "must specifically plead facts to show (1) the
time and manner of discovery *and* (2) the inability to have made earlier discovery
despite reasonable diligence.   The burden is on the plaintiff to show diligence...."
*McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999) (emphasis in
original).   "When there has been a belated discovery of the cause of action, the issue
whether the plaintiff exercised reasonable diligence is a question of fact for the court
or jury to decide. The drastic remedy of summary judgment may not be granted unless
reasonable minds can draw only one conclusion from the evidence." *Enfield v. Hunt*,
91 Cal. App. 3d 417, 419-20 (1979).

Because the Stoccos filed this action on April 19, 2012 (ECF No. 1 at 1), the
Stoccos have the burden of proof at trial that they had no reason to discover that GIA
was not contributing to their Social Security accounts before April 19, 2010.

It is undisputed that U.S. Social Security taxes were deducted from both
Frederick and Kathleen Stoccos' paychecks issued by GIA until April of 1992.  It is
undisputed that wages and other employment benefits were only paid by GIA Italy
after April of 1992.  Both Frederick and Kathleen Stocco testified that they were paid
by GIA Italy after April of 1992 and that they never saw U.S. Social Security tax

deductions on their own wage statements after April of 1992. (F. Stocco Dep. at 39:16-19, 39:24-40:5, ECF No. 46-4 at 16-17; K. Stocco Dep. at 77:5-79:16, ECF No. 48-6 at 16-18).  Kathleen Stocco testified that GIA Italy never issued a payment to the U.S. Social Security system.  (K. Stocco Dep. at 81:4-14, ECF No. 46-5 at 38).  Frederick Stocco testified that an Italian CPA would prepare all GIA Italy employee paychecks, and he or Kathleen Stocco would sign the paychecks and review the wage statements. (F. Stocco Dep. at 35:7-37:23, ECF No. 46-4 at 13-15).

It is undisputed that Frederick Stocco understood that if GIA filed a certificate of coverage, the Stoccos would not be required to pay into the Italian Social Security System.  (Pls.' RSSUF ¶ 7, ECF No. 48-2 at 3).  It is also undisputed that from 1996 to 2011, GIA Italy contributed to the Italian social insurance system on behalf of the Stoccos, and that the Stoccos also contributed to the Italian system. *Id.* ¶ 25.  Kathleen Stocco testified that she was responsible for making payments on behalf of GIA Italy into the Italian social insurance system and that GIA Italy wage statements would show deductions for Italian social insurance taxes.  (K. Stocco Dep. at 61:21-62:8, ECF No. 46-5 at 29-30).

The Court finds that Defendant has met its initial summary burden of pointing to evidence that the Stoccos had "reason to discover" before April 19, 2010, and failed to exercise "reasonable diligence" in discovering, before April 19, 2010, that Defendant GIA was not contributing to the Stoccos' U.S. Social Security accounts. *Norgart*, 21 Cal. 4th at 397; *Enfield*, 91 Cal. App. 3d at 419-20.  The only evidence submitted by the Stoccos to support application of the discovery rule is Frederick Stocco's testimony that he had "no reason" to communicate with the Social Security Administration prior to 2011.  (F. Stocco Dep. at 51:12-24, ECF No. 46-4 at 28).  However, Frederick Stocco testified that there was nothing that prevented him from communicating with the Social Security Administration prior to that time, and that GIA did not prevent him from doing so. *Id.* at 52:1-12.  The Stoccos have presented no evidence that Frederick Stocco was prevented from communicating with Defendant GIA to confirm that it was making

payments into the Stoccos' U.S. Social Security accounts.  The Court finds that Frederick Stocco's conclusory statement that he had no reason to communicate with the Social Security Administration prior to 2011 is insufficient to create a triable issue of material fact as to his reasonable diligence, when Frederick Stocco also testified that he never saw any U.S. Social Security deductions after April 1992, that he was aware of his contributions to the Italian system, and that nothing prevented him from inquiring at an earlier date.  The Court further finds that Kathleen Stocco has presented no evidence to create a triable issue of material fact as to her reasonable diligence.

Although the question of a plaintiff's exercise of "reasonable diligence is a question of fact for the court or jury to decide," summary judgment may be granted where "reasonable minds can draw only one conclusion from the evidence." *Enfield v. Hunt*, 91 Cal. App. 3d 417, 419-20 (1979).  The Court finds that the Stoccos had "reason to discover" as early as 1996 that Defendant GIA was not contributing to their U.S. Social Security accounts after April of 1992.  *Norgart*, 21 Cal. 4th at 397. Frederick Stocco testified that he understood that he would be exempt from paying into the Italian social insurance system if the certificate of coverage was filed. (Pls.' RSSUF ¶ 7, ECF No. 48-2 at 3).  It is undisputed that from 1996 to 2011, GIA Italy contributed to the Italian social insurance system on behalf of the Stoccos, and that the Stoccos contributed to this system.  *Id.* ¶ 25. Once they began making payments into the Italian system, coupled with no indication on their wage statements that U.S. Social Security benefits were being paid by GIA, the Stoccos should have been alerted that Defendant GIA was not contributing to their U.S. Social Security accounts.[5]  The Court concludes that, at least as early as 1996, the Stoccos had "reason to discover" that Defendant GIA

_____

[5]   Frederick Stocco testified that the contributions made to the Italian system were not for "social insurance benefits" but were part of a "welfare" system.  (F. Stocco. Dep. at 40:6-16, 44:15-24, 47:18-49:2, 52:13-53:3, ECF No. 48-7 at 7-16).  The Court finds that this testimony does not raise a triable issue of fact as to the Stoccos' reasonable diligence.  Even if Frederick Stocco was confused about the nature of the contributions he was making into the Italian system between 1992 and 2010, Frederick Stocco's failure to inquire further was not reasonable, given the fact that he understood that he "wouldn't have to pay into [Italy's] Social Security" if a certificate of coverage was filed on his behalf.  (F. Stocco Dep. 54:20-21, ECF No. 46-4 at 30).

was not contributing to their U.S. Social Security accounts. *Norgart*, 21 Cal. 4th at 397.

In addition, the Court finds that the Stoccos failed to exercise "reasonable diligence" as early as 1996, when the Stoccos began making payments into the Italian social insurance system. *Enfield*, 91 Cal. App. 3d at 419-20. Reasonable diligence would entail the Stoccos inquiring with Defendant GIA or the U.S. Social Security Administration in 1996 that contributions were being made on their behalf; the Stoccos were not prevented at any time after 1996 from doing so.

Additional evidence in the record demonstrates the Stoccos failure to exercise reasonable diligence at an even earlier date: 1992.  First, nothing in the Stoccos employment agreements referenced U.S. Social Security benefits or a certificate of coverage.  Second, there is no evidence of any other written promise by GIA to provide the Stoccos with U.S. Social Security benefits.  Third, the Stoccos have conceded that Internal Revenue Code section 3121(l)(1), the provision permitting Americans working abroad to receive U.S. Social Security benefits, is permissive in nature and did not impose a duty on Defendant to file a certificate of coverage on the Stoccos' behalf. (ECF No. 46-1 at 19-20; ECF No. 48-1 at 13).  Fourth, there is no evidence that Defendant GIA had a policy of providing U.S. Social Security benefits to employees of its foreign subsidiaries working abroad.  Finally, despite the fact that the Stoccos were actively involved in GIA Italy's financials and payroll, they never received any indication after April 1992 that U.S. Social Security contributions were being made on their behalf, such as contribution statements or tax documentation from Defendant GIA. The Court concludes that, beginning in 1992, the Stoccos failed to exercise reasonable diligence in discovering that Defendant GIA was not contributing to their U.S. Social Security accounts.

After reviewing the record in this case, the Court concludes that "reasonable minds can draw only one conclusion from the evidence[,]" that the Stoccos had reason to discover, and failed to exercise reasonable diligence in discovering, as early as 1992

1    that Defendant GIA was not contributing to their U.S. Social Security accounts.

2    *Enfield*, 91 Cal. App. 3d at 419-20; *Norgart*, 21 Cal. 4th at 397.

3              **ii. Duty**

4         Even assuming that "reasonable minds" can draw opposite conclusions as to

5    whether the Stoccos' had reason to discover, or exercised reasonable diligence in

6    discovering, some time before April 19, 2010, that Defendant GIA did not contribute

7    to their U.S. Social Security accounts for the 1992-2007 period, the Court finds that

8    Plaintiffs have failed to raise a triable issue of fact as to whether Defendant owed the

9    Stoccos a duty to file the certificates of coverage.

10        The only duty alleged in the SAC is based on Internal Revenue Code section

11   3121(l)(1), which permits Americans employed abroad to participate in the U.S. Social

12   Security System.  Defendant contends that Internal Revenue Code section 3121(l)(1)

13   is permissive in that an employer may, but is not required to, file certificates of

14   coverage on behalf of an American employee working abroad.  In opposition, the

15   Stoccos concede this point, but contend that "GIA owed a duty of care based upon the

16   employment relationship of the parties, the contractual relationship of the parties, GIA's

17   voluntary assumption of a duty, and/or based upon the totality of the circumstances."

18   (ECF No. 48-1 at 13).

19        The Court requested supplemental briefing on the duties raised by the Stoccos

20   in opposition.  The Stoccos cite to *Coffee v. McDonnell-Douglas Corp.*, 8 Cal. 3d 551

21   (1972) for the proposition that "[a]n employer may be liable on the theory of negligent

22   performance of a duty voluntarily assumed."  (ECF No. 63 at 2).  The Stoccos contend

23   that this obligation is derived from section 323 of the Restatement (Second) of Torts.

24   The Stoccos cite to *Castaneda v. Olsher*, 41 Cal. 4th 1205 (2007) for the proposition

25   that the *Rowland v. Christian*, 69 Cal. 2d 108 (1968) factors support the finding of a

26   duty under the totality of the circumstances presented in this case.

27        In response, Defendant contends that the Stoccos are precluded from proceeding

28   on new duty theories that are not articulated in the SAC.  With respect to the Stoccos'

voluntarily assumed duty contention, Defendant contends that *Coffee* is distinguishable because it did not involve the non-performance of a promise.  With respect to the Stoccos' "totality of the circumstances" contention, Defendant contends that the Stoccos have cited no case law that creates a duty purely by the "totality of the circumstances." (ECF No. 64 at 8).  Defendant contends that no duty should arise under the circumstances of this case because Defendant did not have a policy of filing certificates of coverage for foreign-based employees and did not agree to file a certificate of coverage in the Stoccos' employment agreements.  Defendant contends that finding a duty to file the certificate of coverage would usurp Congress's intent in drafting IRC Section 3121(l)(1).

### a.  Contractual Duty/Employment Duty

It is undisputed that the Stoccos' employment with GIA was governed by employment agreements that do not reference U.S. Social Security or certificates of coverage and expired on December 15, 2013.  (Pls.' RSSUF ¶¶ 5, 9, ECF No. 48-2 at 2-4).   The Stoccos have failed to come forward with evidence giving rise to a contractual or employer duty to provide U.S. Social Security benefits, rather than Italian social insurance benefits, for their employment abroad with GIA Italy.  The Court concludes that the Stoccos have failed to establish a contractual or employment duty to file the certificate of coverage or provide U.S. Social Security benefits to the Stoccos from April 1992 until 2007.

### b.  Assumption of a Duty

The Stoccos indicate in supplemental briefing that their negligence claim is based upon an assumption of a duty theory premised on *Coffee v. McDonnell-Douglas Corp.*, 8 Cal. 3d 551 (1972).  In *Coffee*, the plaintiff, a prospective pilot, was required to undergo a pre-employment physical examination to establish his physical fitness for the job.  The plaintiff passed the examination and began work as a pilot.  Several months later, the plaintiff collapsed from exhaustion after returning from an extended flight. The plaintiff was diagnosed with multiple myeloma.  The plaintiff alleged that the

1   defendant should have discovered his condition, and alleged that his disease progressed

2   as a result of the defendant's failure to uncover the condition.

3        The California Supreme Court began its analysis by recognizing that "[a]n

4   employer generally owes no duty to his prospective employees to ascertain whether

5   they are physically fit for the job they seek, but where he assumes such duty, he is liable

6   if he performs it negligently." *Id.* at 557.  The court stated that "[t]he obligation

7   assumed by an employer is derived from the general principle expressed in section 323

8   of the Restatement Second of Torts, that one who voluntarily undertakes to perform an

9   action must do so with due care." *Id.*  The court found that a relationship giving rise to

10  a duty was formed "when defendant undertook, although voluntarily, to examine

11  plaintiff so as to ascertain his physical fitness for duties as a pilot." *Id.* at 559.  The

12  California Supreme Court articulated the test as follows: "[W]hether the employer in

13  such instance is liable for not discovering the disease depends upon whether or not in

14  the light of all the circumstances he conducted and completed the examination with due

15  care.  Included among the relevant circumstances is the purpose of the examination."

16  *Id.*

17       The holding in *Coffee* was based on the Restatement (Second) of Torts, section

18  323, which provides:

19       One who undertakes, gratuitously or for consideration, to render services
         to another which he should recognize as necessary for the protection of the
20       other's person or things, is subject to liability to the other for physical
         harm resulting from his failure to exercise reasonable care to perform his
21       undertaking, if

22       (a) his failure to exercise such care increases the risk of such harm, or

23       (b) the harm is suffered because of the other's reliance upon the
         undertaking.
24
    Restatement (Second) of Torts, § 323 (1965).
25
         The duty recognized in *Coffee* and section 323 of the Restatement (Second) of
26
    Torts has no applicability to this case.  In this case, the parties entered two employment
27
    agreements to employ the Stoccos abroad.  The dispute in this case is whether U.S.
28
    Social Security benefits were a part of the bargained-for employment agreement

between the Stoccos and Defendant GIA.  No voluntarily assumed duty of care to pay into the U.S. Social Security system from April of 1992 until 2007 arose from the contractual negotiations between the Stoccos and Defendant GIA.  The written employment agreements made no reference to U.S. Social Security.  The Court concludes that the Stoccos have failed to raise a triable issue of fact as to Defendant GIA voluntarily assuming a duty of care to provide the Stoccos an employment benefit in the form of U.S. Social Security contributions.

### c.  Totality of Circumstances

The Stoccos indicate in supplemental briefing that the alleged duty based on the "totality of the circumstances" is based on the *Rowland v. Christian*, 69 Cal. 2d 108 (1968) factors for determining when a court should impose a duty of care in a particular case.

"Whether a duty of care is owed is a legal question, and is decided on a case-by-case basis." *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1610 (2009) (citing *Bily v. Arthur Young &* Co., 3 Cal. 4 th 370, 397 (1992) and *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 806 (1979)).  California Civil Code section 1714, subdivision (a) provides that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occassioned to another by his or her want of ordinary skill in the management of his or her property or person...."  Cal. Civ. Code § 1714(a).

> A departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rowland v. Christian*, 69 Cal. 2d 108, 112-13 (1968).  Three other factors are to be considered before a duty can be found: "(1) liability may in particular cases be out of proportion to fault; (2) parties should be encouraged to rely on their own ability to protect themselves through their own prudence, diligence and contracting power; and

(3) the potential adverse impact on the class of defendants upon whom the duty is imposed." *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1198 (9th Cir. 2001) (citing *Bily*, 3 Cal. 4th at 399-405).

> Liability for negligent conduct may only be imposed where there is a duty of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member. A duty of care may arise through statute or by contract. Alternatively, a duty may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society.

*J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979) (citing *Richards v. Stanley*, 43 Cal. 2d 60, 63 (1954) and *Valdez v. J.D. Diffenbaugh Co.*, 51 Cal. App. 3d 494, 505 (1975)).

"[W]here the 'negligent' performance of a contract amounts to nothing more than a *failure* to perform the express terms of the contract, the claim is one for contract breach, not negligence." *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 774 (1997) (emphasis in original). "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999). "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994) (quoting *Jones v. Kelly*, 208 Cal. 251, 255 (1929)); *see also Erlich*, 21 Cal. 4th at 552 ("[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.") (quoting *Freeman & Mills*, *Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 107 (1995) (Mosk, J., concurring in part and dissenting in part)).

The Stoccos contend that the *Rowland* factors support the imposition of a negligence duty in this case because:

> It was foreseeable and substantially certain that if the Stoccos were excluded from the US Social Security system they would suffer pecuniary harm in the form of a reduction or loss of benefits and increased contribution rate. There is a direct connection between GIA USA's failure to file certificates of coverage and the Stocco's injury. The Stoccos would

not have moved to Italy if they knew that they would be excluded from the U.S. Social Security system due to GIA USA's failure to file certificates of coverage for them. If GIA USA is not held accountable for their negligent conduct towards their employees, they will continue to engage in similar conduct with their employees in the future.

(ECF No. 63 at 4). Defendant contends that:

[T]he totality of the circumstances in this case compel the conclusion that GIA did not have a duty to file a certificate of coverage on Plaintiffs' behalf. Plaintiffs have pointed to no established duty under the law or facts that make them special or different from any other employee going to work oversees. Indeed, Plaintiffs' employment relationship was governed by express employment agreements, which did not articulate any obligation by GIA to file a certificate of coverage. Moreover, GIA did not (and does not) have a policy of filing certificates of coverage on behalf of foreign-based employees, which could have given Plaintiffs an expectation that one would be filed on their behalf. (Decl. of Bev Hori at ¶¶ 4-5.) Finally, despite their assertion that filing a certificate of coverage is a "common practice in the trade," Plaintiffs tellingly have provided no evidence that this is in fact true.

(ECF No. 64 at 8-9).

In this case, the alleged duty arises from Defendant's failure to provide U.S. Social Security benefits as promised by a GIA representative at the time of the Stoccos' hiring. This alleged duty involves employment benefits; it is contractual in nature. The alleged wrong is failing to perform as promised. "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." *Applied Equip. Corp.*, 7 Cal. 4th at 515. The Stoccos have identified no basis for finding a *legal* duty other than a potential *contractual* duty arising from a promise to file certificates of coverage. Even assuming the failure to perform a contractual obligation could give rise to a duty of care, the Court concludes that it cannot extend the general duty of care to the circumstances presented in this case, after weighing the factors articulated in *Rowland* and its progeny.

First, it is undisputed that employment contracts governed the Stoccos' employment with Defendant GIA. There is no evidence in the record suggesting that the parties were in any way prevented from including certificates of coverage in the Stoccos' employment contracts. There is no evidence in the record that Defendant GIA had a policy of filing certificates of coverage for American employees working abroad.

Second, there is no evidence that Defendant GIA intended to induce the Stoccos' reliance on the promise to file certificates of coverage on the Stoccos' behalf.  Nor is there evidence that Defendant GIA promised to file the certificates of coverage or provide U.S. Social Security benefits on any other occasion than GIA representative Dennis Foltz stating, in 1991, that the certificates of coverage would be filed. Defendant GIA contributed to the Stoccos' U.S. Social Security accounts until April 1992, and there was no promise by Defendant GIA that contributions would be made thereafter.[6]

After weighing the factors articulated in *Rowland* and its progeny, the Court concludes that the general duty of care should not be extended to the facts of this case.

### iii. Damages

Even assuming that the Stoccos have raised a triable issue of fact as to equitable tolling of the statute of limitations, and assuming that Defendant GIA owed the Stoccos a duty to file certificates of coverage on their behalf, the Court finds that the Stoccos have failed to raise a triable issue of fact as to any damages.

Defendant contends that the Stoccos have produced no evidence demonstrating that any alleged damages were not completely offset by the Italian social insurance and U.S. Social Security benefits that they have received or will receive.  The Stoccos contend that they have been damaged in the amount of U.S. Social Security benefits to which they would have been entitled had the certificate of coverage been filed.  The Stoccos contend that they have been damaged at least during the 1992-1996 period, where they were "participating in neither the U.S. Social Security system nor the Istituto Nazionale della Previdenza Sociale ('INPS')."  (ECF No. 48-1 at 14).  The Stoccos pointed to no evidence in the record demonstrating their damages.

The Court requested supplemental briefing on "[t]he plaintiff's obligation at the summary judgment stage, if any, to come forward with evidence demonstrating the

---

[6] There is no evidence in the record that Dennis Foltz represented that the certificates of coverage would cover a period beyond April 1992 or the expiration of their employment agreements in December of 1993.

existence of and extent of damages in claims for fraudulent misrepresentation, negligence, and breach of contract." (ECF No. 62 at 1-2). The Stoccos cite to *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 107 (2004) for the proposition that a "plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively negating that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence." (ECF No. 63 at 6). The Stoccos submit the Declaration of Frederick Stocco in support of their supplemental briefing to show that the Stoccos lost money by contributing to the Italian system in lieu of the U.S. system because the contribution rates were higher.[7]

In response, Defendant cites *Celotex*, 477 U.S. at 323 and 325 for the proposition that a defendant has no burden to "negate or disprove matters on which plaintiffs have the burden of proof." (ECF No. 64 at 12). Defendant cites *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001) for the proposition that a plaintiff must present non-speculative evidence of damages at the summary judgment stage. Defendant contends that the Court should not consider the Stoccos' newly submitted evidence of damages. Defendant contends that the Stoccos never provided Defendant with evidence of their damages in their initial disclosures, or made evidence available for inspection.

In California, the elements of negligence are (1) duty, (2) breach of duty, (3) proximate cause, and (4) damages. *Paz v. State of California*, 22 Cal. 4th 550, 559 (2000). An essential element of a negligence claim is damages. Summary judgment is proper for a "failure to introduce any evidence of damages," where damages are an essential element of the claim. *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 752 (9th Cir. 2001) (affirming summary judgment on takings claims, where the plaintiff failed to

---

[7] The Court declines to consider new evidence submitted in support of the parties supplemental briefing. The Court's November 7, 2014 Order requested further briefing on three issues already raised in the summary judgment briefing. The Court did not request or permit the submission of new evidence in support or opposition to the motion for summary judgment.

introduce evidence of damages, because takings claims "require proof that the regulatory action caused deprivation of all economic use"). "Summary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (affirming summary judgment because the plaintiffs failed to come forward with competent evidence as to the amount of their damages after the district court excluded their damages expert's report).

It is undisputed that GIA stopped making payments into the U.S. Social Security system on the Stoccos' behalf in 1992. (Pls.' RSSUF ¶ 19, ECF No. 48-2 at 6). It is also undisputed that "[s]tatements provided to the Stoccos by the Istituto Nazionale della Previdenza Social ('INPS') indicate that beginning in 1996 and continuing through 2011, GIA Italy (and later GIA Florence) contributed to the Italian social insurance system on behalf of the Stoccos. The statements indicate that the Stoccos also contributed to their respective INPS Accounts." *Id.* ¶ 25. It is undisputed that in 2012, Frederick Stocco began collecting 597 Euros per month from the Italian social insurance system. *Id.* ¶ 28. It is undisputed that Kathleen Stocco will be eligible for Italian social insurance benefits when she turns 71. *Id.* ¶ 30.

Defendant has met its initial summary judgment burden by pointing to evidence demonstrating that the Stoccos' damages may be entirely offset by contributions to the Italian social insurance system. Defendant has submitted two Statements of Account Contributions by the INPS for both Frederick and Kathleen Stocco. (Dal Bon Decl. Exs. 1-2, ECF Nos. 46-24, 46-25). Frederick Stocco's statement shows contributions made to the Italian system between 1996 and 2009. (Dal Bon Decl. Ex. 1, ECF No. 46-24). Kathleen Stocco's statement shows contributions made to the Italian system between 1996 and 2008. (Dal Bon Decl. Ex. 2, ECF No. 46-25).

The Stoccos have come forward with no evidence demonstrating that they were actually damaged by contributions to the Italian social insurance system in lieu of

contributions to the U.S. Social Security system.  The Stoccos have come forward with no evidence demonstrating that their benefits under the Italian social insurance system are less than what they could have expected to receive in U.S. Social Security benefits. The Court concludes that the Stoccos have failed to raise a triable issue of fact as to damages resulting from Defendant GIA's failure to file a certificate of coverage or contribute to the Stoccos' U.S. Social Security accounts.

### iv.  Conclusion

Defendant's motion for summary judgment on the Stoccos' negligence claim is granted on the following grounds: (1) the negligence claim is barred by the applicable statute of limitations; (2) the Stoccos have failed to establish that Defendant owed them a duty to file a certificate of coverage or make contributions to their U.S. Social Security accounts after April of 1992; and (3) the Stoccos have failed to raise a triable issue of fact as to any damages resulting from Defendant GIA's failure to file a certificate of coverage and failure to make contributions to the Stoccos' U.S. Social Security accounts after April 1992.

### C.  First Claim for Fraud - Misrepresentation (by the Stoccos)

The Stoccos' fraudulent misrepresentation claim relies upon Dennis Foltz's alleged representation that GIA would file certificates of coverage on the Stoccos' behalf.  The Stoccos assert that Dennis Foltz's statement was made fraudulently in order to induce the Stoccos into employment with GIA.  The Stoccos assert that they relied upon this representation to their detriment because they believed over the ensuing fifteen year employment period that they were receiving U.S. Social Security contributions from GIA, when, in fact, they were not receiving any U.S. Social Security contributions.

Defendant moves for summary judgment on the Stoccos' fraudulent misrepresentation claim on five grounds.  First, Defendant contends that there was no representation ever made to Kathleen Stocco.  Second, Defendant contends that the alleged misrepresentation by Dennis Foltz is barred by the parol evidence rule.  Third,

Defendant contends that the Stoccos cannot demonstrate Defendant's intent to defraud. Fourth, Defendant contends that the Stoccos have produced no evidence of damages. Finally, Defendants contend that the claim is barred by the statute of limitations.

### i. Statute of Limitations

In California, "[a]n action for relief on the ground of fraud or mistake" has a statutory period of three years. Cal. Code Civ. Proc. § 338(d). "The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* "Code of Civil Procedure section 338, subdivision (d), effectively codifies the delayed discovery rule in connection with actions for fraud, providing that a cause of action for fraud 'is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.' In a case such as this, that date is the date the complaining party learns, or at least is put on notice, that a representation was false." *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 35 (2003) (quoting Cal. Code Civ. Proc. § 338(d)). "All that is relevant is that a reasonable person ... would have been on notice of a potential misrepresentation." *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007).

As with the Stoccos' negligence claim, the Stoccos were on notice that they were not receiving U.S. Social Security benefits when they were aware that there were no deductions for U.S. Social Security on their wage statements. The Stoccos were on further notice that they were not receiving U.S. Social Security benefits when they were contributing to an Italian system that they would have been exempt from had the certificate of coverage been filed. The Stoccos do not raise a triable issue of fact by introducing Frederick Stocco's conclusory testimony that he had no reason to discover Defendant's failure to file the certificate of coverage until he turned sixty-five. The Court concludes that the Stoccos' fraudulent misrepresentation claim is barred by the statute of limitations because a "reasonable person [in this case] ... would have been on notice of a potential misrepresentation" regarding the filing of certificates of coverage

long before April 19, 2009 (three years prior to the commencement of this case). *Hamilton Materials*, 494 F.3d at 1207.

### ii. Intent to Defraud

Even assuming that the Stoccos have raised a triable issue of fact as to their reasonable diligence in failing to discover "a potential misrepresentation," *Hamilton Materials*, 494 F.3d at 1207, the Court finds that the Stoccos have failed to meet their burden in coming forward with evidence to demonstrate that Defendant GIA's representative Dennis Foltz made a promise to file certificates of coverage with fraudulent intent.

"'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Id.* In a promissory fraud action, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985) (quoting *People v. Ashley*, 42 Cal. 2d 246, 263 (1954)).

> To be sure, fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform. However, if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury.

*Id.* at 30-31 (citing Prosser, Torts, § 109, pp. 764-65 (5th ed. 1984)).

It is undisputed that "Fred[erick] Stocco testified that before accepting the position with GIA he was looking for a job in Italy as a gemologist, working in the jewelry trade and that he was unaware of what a certificate of coverage was." (Pls.' RSSUF ¶ 45, ECF No. 48-2 at 14). Kathleen Stocco testified that she would have turned down the position had she known that Defendant would not file a certificate of

coverage on her behalf.  (K. Stocco Dep. at 102:15-103:12, ECF No. 48-6 at 25-26).
Kathleen Stocco also testified that Chris Kennan, a "colleague" and head of GIA
Bangkok, told her that "[y]ou get paid like [you have] always been paid."[8]  *Id.* at 86:8-
14.

The Stoccos have come forward with no evidence, whether circumstantial or
direct, that demonstrates or permits the inference that Defendant GIA had no intention
of filing certificates of coverage when Dennis Foltz allegedly promised to do so.  The
fact that the certificate of coverage was important to Kathleen Stocco's decision to
accept the position with GIA Italy does not permit the inference that Defendant
intended to defraud her, absent any evidence that Defendant was aware of its
importance to Kathleen Stocco.  Frederick Stocco has not come forward with evidence
demonstrating that the filing of a certificate of coverage was an important factor in his
decision to accept employment at GIA Italy.[9]

The Court concludes that the Stoccos have failed to meet their burden to come
forward with any evidence that would permit a finding that a representative of GIA
promised to file the certificate of coverage on the Stoccos' behalf with no intention of
doing so.  *Lazar*, 12 Cal. 4th at 638.  The Court concludes that Defendant's failure to
file the certificate of coverage, without more, does not permit a finding of an intent to
defraud.  *Tenzer*, 39 Cal. 3d at 30.

### iii.  Damages

Even assuming the Stoccos have raised a triable issue of fact as to the statute of

---

[8]  The Stoccos have come forward with no evidence demonstrating when this statement was made, whether it was made during the hiring process, whether Chris Kennan was involved in the hiring process, or whether Chris Kennan's representations could bind GIA.  Chris Kennan's statement appears to be a stray comment made by one colleague (Chris Kennan, as head of GIA Bangkok) to another (Kathleen Stocco, in charge of GIA Italy's day-to-day operations).

[9]  At oral argument, the parties discussed at length an exhibit produced by the Stoccos which appears to be a certificate of coverage prepared for Kathleen Stocco.  *See* Hickman Decl. Ex. 11, ECF No. 48-15.  The Stoccos contend that Kathleen Stocco was given a copy of this certificate of coverage with her name on it.  (ECF No. 48-1 at 15-16).  Because this document has not been authenticated, the Court does not consider it, and no inferences can be drawn from it.

limitations and as to Defendant GIA's fraudulent intent, the Court finds that, as with the Stoccos' negligence claim, the Stoccos' have failed to meet their burden to come forward with evidence demonstrating their damages. *See Bldg. Permit Consultants, Inc. v. Mazur*, 122 Cal. App. 4th 1400, 1415 (2004) ("[A]ctionable deceit ... requires damages resulting from reliance on a misrepresentation. 'Fraud without damages is not actionable.'" ) (citing Cal. Civ. Code § 1709 and quoting *Furia v. Helm*, 111 Cal. App. 4th 945, 956 (2003)).

### iv.  Conclusion

Defendant's motion for summary judgment on the Stoccos' fraudulent misrepresentation claim is granted on the following grounds:   (1) the Stoccos' fraudulent misrepresentation claim is barred by the applicable statute of limitations; (2) the Stoccos have failed to raise a triable issue of fact as to Defendant GIA's intent to defraud them; and (3) the Stoccos have failed to create a triable issue of fact as to their damages resulting from Defendant GIA's alleged fraud.

### D.  Third Claim for Breach of Written Contract (by GIA Italy)

GIA Italy asserts that GIA entered into the Firgem Agreement, *i.e.*, the Articles of Incorporation of the Firgem Foundation, on behalf of GIA and GIA Italy.  GIA Italy asserts that it is an intended beneficiary of the Firgem Agreement in that the Firgem Agreement obligated GIA to authorize GIA Italy to issue GIA gem grading certificates and provide support for GIA Italy in opening a gem grading lab, gem take-in location, or gem drop-off window.  GIA Italy asserts that Defendant GIA breached these obligations in 2011 by withdrawing support for the Firgem Foundation and GIA Italy in opening a gem grading lab, gem take-in location, or gem drop-off window; and by not permitting GIA Italy to issue GIA gem grading certificates.  Defendant GIA moves for summary judgment on GIA Italy's breach of contract claim on three grounds:(1) GIA Italy is not a third-party beneficiary under the Firgem Agreement; (2) the Firgem Agreement is not a contract enforceable against GIA for any obligations; and (3) GIA Italy lacks any evidence of its damages.

The Firgem Agreement states: "By the initiative of the [Florence Chamber of Commerce], the Gemological Institute of America based in Carlsbad USA (hereinafter also called GIA) and [the University of Florence], the Founding Organizations, the Foundation named "FIRENZE SCIENZE GEMMOLOGICHE" ["Firgem Foundation"] is founded." (SAC Ex. 4 at 103, ECF No. 29-2 at 103). The Firgem Agreement further states:

> The purpose of the Foundation, which is not for profit and is apolitical, shall be to exclusively pursue goals that encourage and support the creation of a multi-purpose center to promote study and research in the field of gemology, in particular with regard to certification and study of diamonds, gemstones, and precious metals; to promote training, study and research in the field of gold jewelry design and production. These activities will help to promote the city of Florence as a world reference in the field of jewelry and in the innovation related to it, to the advantage of the satellite industries that are existing or are to be developed in the future, promoting de facto in Florence the economy and culture of "learning by doing" according to strict ethical rules. The Foundation will provide economic and financial support of the Foundation's initiatives, delegating to [GIA Italy] the operational part of the activities and providing the premises of the Foundation to the above as a "free of charge loan for use".
>
> The activity that [GIA Italy] will carry out independently will be aimed at:
>
> 1. Performing the analysis of precious stones and metals, issuing globally recognized GIA Carlsbad certificates;
>
> 2. Performing Gemological training according to GIA Carlsbad study plans issuing worldwide recognized diplomas;
>
> 3. Managing training and study of goldsmith design according to GIA Carlsbad study plans to be reconciled and harmonized with the culture and history of Florence and issuing diplomas that are customized for this purpose to be made globally recognized;
>
> 4. Managing the training of goldsmith worker training in the fields of production, sales and marketing according to GIA Carlsbad study plans to be customized and connected to the history and tradition of Florence;
>
> 5. Encouraging the emergence and growth of interest and international businesses to be located in Florence.

*Id.* at 104-05. The Firgem Agreement further provides: "The associates are entitled to exercise the right of withdrawal by means of a notification to be made by registered letter with acknowledgment of receipt at least six months before." *Id.* at 112-13.

### i. Standing under the Firgem Agreement

Defendant contends that GIA Italy lacks standing to enforce the Firgem Agreement because it is not a party to or intended beneficiary of the Firgem Agreement. Defendant contends that the language of the Firgem Agreement does not provide that GIA Italy is to benefit from Defendant GIA's alleged promises contained in the Firgem Agreement, *i.e.*, allowing GIA Italy to issue GIA gem grading certificates or aiding GIA Italy in opening a gem grading lab, gem drop-off location, or gem take-in window. Defendant contends that GIA Italy's expected revenue from a gem lab arose from a separate agreement between Frederick Stocco and the Florence Chamber of Commerce.[10]

GIA Italy contends that it was an express third-party beneficiary of the Firgem Agreement.   GIA Italy contends that summary judgment is improper because "contradictory inferences" of the intent of the parties to the Firgem Agreement may be drawn as to whether GIA Italy was an intended beneficiary of the Firgem Agreement. (ECF No. 48-1 at 22).

Under California law, a third party may enforce a contract if the contract is "made expressly for the benefit of a third person...." Cal. Civ. Code § 1559. "A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident." *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821-22 (9th Cir. 1985) (citing *Strauss v. Summerhays*, 157 Cal. App. 3d 806, 816 (1984)).  Although a third party need not be expressly named or identified in a contract, a party must demonstrate "that [it] is a member of a class of persons for whose benefit it was made."  *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1023 (2009) (quoting *Garratt v. Baker*, 5 Cal. 2d 745, 748 (1936)).  "If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence

_____

[10]  Frederick Stocco testified that, some time after they acquired ownership of GIA Italy in 2007, the Florence Chamber of Commerce agreed to provide eighty-percent of the revenues from a gem grading lab to fund the school, which formed their expectation of receiving revenue from a gem grading lab.  (F. Stocco Dep. at 128:4-131:4, 140:18-141:1, ECF No. 46-6 at 35-38, 46-47).

the parties thereto, contemplate a benefit to the third person." *Id.* at 1022 (quoting *Johnson v. Holmes Tuttle Lincoln–Merc.*, 160 Cal. App. 2d 290, 297 (1958)). "The fact that the third party is only incidentally named in the contract or that the contract, if carried out to its terms, would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement." *Jones v. Aetna Cas. & Sur. Co.*, 26 Cal. App. 4th 1717, 1724-25 (1994). "Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Landale–Cameron Court, Inc. v. Ahonen*, 155 Cal. App. 4th 1401, 1411 (2007) (quotation and citation omitted).

> Ascertaining this intent is a question of ordinary contract interpretation. Thus, "[t]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement."
>
> Under long standing contract law, a "contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Although "the intention of the parties is to be ascertained from the writing alone, if possible," "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." "However broad may be the terms of a contract, it extends only to those things which it appears that the parties intended to contract."

*Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002) (citing *Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 436 (1984) and quoting *Neverkovec v. Fredericks*, 74 Cal. App. 4th 337, 348 (1999) and Cal. Civ. Code §§ 1636, 1639, 1647, 1648). "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Cal. Civ. Code § 1649.

The parties to the Firgem Agreement were GIA, the University of Florence, and the Florence Chamber of Commerce. The purpose of the Firgem Agreement was to incorporate the Firgem Foundation. The Firgem Agreement states at Article 5 that the purpose of the Firgem Foundation is to:

> exclusively pursue goals that encourage and support the creation of a multi-purpose center to promote study and research in the field of

gemology, in particular with regard to certification and study of diamonds, gemstones, and precious metals; to promote training, study and research in the field of gold jewelry design and production.  These activities will help to promote the city of Florence as a world reference in the field of jewelry and in the innovation related to it, to the advantage of the satellite industries that are existing or are to be developed in the future, promoting de facto in Florence the economy and culture of 'learning by doing' according to strict ethical rules.

(SAC Ex. 4 at 104-05, ECF No. 29-2 at 104-05).  The Firgem Agreement also provides at Article 5 that "[t]he Foundation will provide economic and financial support of the Foundation's initiatives, delegating to [GIA Italy] the operational part of the activities and providing the premises of the Foundation to the above as a 'free of charge loan for use.'" *Id.*

The Court finds that the intent of the Firgem Agreement was to incorporate the Firgem Foundation, and the terms of the incorporation show no intent for Defendant GIA to provide benefits to GIA Italy, its wholly-owned subsidiary.

The specific provision naming GIA Italy in Article 5 confers no standing on GIA Italy to sue Defendant GIA.  First, the only provision granting GIA Italy a benefit is the provision stating that "[t]he Foundation will ... provid[e] the premises of the Foundation to [GIA Italy] as 'free of charge loan for use.'" (SAC, Ex. 4 at 105, ECF No. 29-2 at 105).  Even if this provision may confer standing to GIA Italy to sue the Firgem Foundation as a third-party beneficiary, it does not confer standing to GIA Italy to sue Defendant GIA. In addition, GIA Italy's breach of contract claim is not based upon Defendant GIA's failure to provide the Firgem Foundation's facilities to GIA Italy for "free of charge loan for use."  *See* ECF No. 29 at 11-12.

The Firgem Agreement also lists certain "activity that [GIA Italy] will carry out independently." (SAC, Ex. 4 at 105; ECF No. 29-2 at 105).  The Court finds that these provisions provide GIA Italy with duties, not benefits.  GIA Italy's duties in "[p]erforming the analysis of precious stones and metals, issuing globally recognized GIA Carlsbad certificates" were to be carried out for the benefit of the Firgem Foundation and its educational goals; any benefits that may inure from GIA Italy carrying out these duties are incidental.  The Firgem Agreement evinces no intent to aid

GIA Italy in opening a gem grading lab, drop-off location, or take-in window because the Firgem Agreement does not reference a gem grading lab, drop-off location, or take-in window.

Even assuming that the intent of the Firgem Agreement is ambiguous, the Court finds that GIA Italy has failed to meet its summary judgment burden to come forward with evidence showing that the intent of the Firgem Agreement was to benefit GIA Italy by permitting it to authorize GIA gem grading certificates or by aiding it to open a gem grading lab, take-in window, or drop-off location.

GIA Italy has presented three pieces of evidence in order to demonstrate an intent to benefit GIA Italy with a gem grading lab, take-in window, or drop-off location. First, Donna Baker, as CEO of GIA, sent an April 10, 2008 letter to the Firgem Foundation, resigning as a counsel member and delegating "all powers to make any decisions and conclude any agreements relative to the Foundation" to GIA Italy. (Hickman Decl. Ex. 8, ECF No. 48-12). Similar to the language of the Firgem Agreement itself, this letter delegates duties to GIA Italy, but it does not evince an intent to aid GIA Italy in opening a gem grading lab, take-in window, or drop-off location.

Second, Frederick Stocco testified that he was given specifications to build a gem lab. (F. Stocco 30(B)(6) Dep. at 40:1-45:25, 50:1-25, 52:1-25, 54:1-25, 56:1-57:25, ECF No. 48-8 at 13-22). Frederick Stocco's testimony reveals that these specifications were given in 2010, after the 2007 and 2009 Licensing Agreements precluded GIA Italy from performing gem grading services, and that he was given these specifications because GIA delegated its Firgem Foundation duties to GIA Italy.[11] This evidence does

---

[11] In 2007, GIA transferred ownership of GIA Italy to the Stoccos and entered into the 2007 Licencing Agreement. (Pls.' RSSUF ¶ 35, ECF No. 48-2 at 10). The 2009 Licensing Agreement replaced the 2007 Licensing Agreement, and was in effect March 2011, when Defendant allegedly withdrew support from GIA Italy and breached the Firgem Agreement. *Id.* ¶¶ 35, 36. The 2009 Licensing Agreement contains the same provision as the 2007 Licensing Agreement:

**No Gem Grading or Identification Services.** Licensee, its affiliates, owners, managers, members, agents, and employees will not operate any trade-service laboratory for the purpose of diamond grading, colored stone grading, or gem identification, without the prior written consent of GIA in each instance.

not demonstrate that the training, analysis, and certificate-issuing tasks delegated to GIA Italy were intended to benefit GIA Italy through the opening of a gem grading lab, drop-off location, or take-in window.

Finally, evidence that Frederick Stocco was granted authority, as council member of the Firgem Foundation, to "oversee feasibility studies, come up with projects, and build a gem-grading drop-off service" is not relevant. (Pl.'s RSSUF ¶ 63, ECF No. 48-2 at 21). Granting Frederick Stocco certain authority as a council member of the Firgem Foundation does not create a contractual obligation to allow GIA Italy to open "a gem-grading drop-off service." *Id.*

The Court concludes that the Firgem Agreement was not intended to benefit GIA Italy with a gem grading lab, take-in window, or drop-off location or the right to issue GIA gem grading certificates.

### ii. Defendant GIA's Obligations under the Firgem Agreement

Even assuming that GIA Italy was an intended beneficiary of the Firgem Agreement, the Court finds that Defendant GIA had no obligation in 2011 to aid GIA Italy in opening a gem grading lab, take-in window, or drop-off location or to authorize GIA Italy to perform GIA gem grading services.

Defendant contends that the Firgem Agreement was not a contract that could be enforced against Defendant GIA. GIA Italy contends that the Firgem Agreement has all of the essential elements of a contract. GIA Italy contends that the Firgem Agreement gave GIA Italy the right to issue GIA certificates, "which can only be done through a lab, take-in, or drop-off window." (ECF No. 48-1 at 22). In reply, Defendant contends that the Stoccos' own deposition testimony was that GIA Italy "'doesn't have anything to do with' the lab or take-in window ... because the Stoccos' License Agreements with GIA expressly precluded the Stoccos (and GIA [Italy]) from having anything to do with those activities." (ECF No. 51 at 13).

---

(SAC Ex. 7 at 211, ECF No. 29-4 at 6).

The Court requested supplemental briefing on the effect, if any, of the 2007 and 2009 Licensing Agreements on GIA Italy's breach of contract claim. GIA Italy contends that the Licensing Agreements have no bearing on its breach of contract claim because the Licensing Agreements prohibited GIA Italy from operating a trade-service laboratory, whereas GIA Italy was supposed to receive financial support from the Firgem Agreement to operate its school. In response, Defendant contends that 2007 and 2009 Licensing Agreements expressly preclude GIA Italy from operating a gem lab or take-in or drop-off location.

Even assuming that the Firgem Agreement obligated Defendant to give GIA Italy the right to issue GIA gem grading certificates or to aid GIA Italy in opening a gem grading lab, drop-off location, or take-in window, the Court finds that Defendant GIA and GIA Italy had effectively modified their agreement before the alleged breach of contract. The SAC alleges that, "[i]n 2011, GIA breached the Firgem Agreement by resigning from and withdrawing support for the Firgem Agreement and then declining to provide any support to GIA Italy for the purpose of opening a gem drop-off window in Florence that was authorized to issue GIA gem grading certificates." (ECF No. 29 at 12). At oral argument, Plaintiffs' counsel confirmed that the breach on which GIA Italy's breach of contract claim is based is the March 22, 2011 letter from GIA CEO Donna Baker.[12] In that letter, Donna Baker wrote to Gregory Winegar of the Florence Chamber of Commerce and Firgem, stating:

> It was brought to our notice ... that the press release contained an error by stating GLS will offer a GIA drop-off service, one of three labs in Europe to do so. Actually, the only such locations in Europe are London and

---

[12] THE COURT: So when GIA wrote the letter that said, you know, we don't want there to be any confusion on this, is it your view that -- your client's position that they couldn't write that letter, that transmitting that letter was the breach?

MR. HICKMAN: That was the breach. That was the breach. When that letter was written, Mr. Galgani, the president of the foundation, called Mr. Stocco into his office, the agreement has been breached. I think he lost a lot of face in Italian at the time because they just had this groundbreaking, and GIA was washing their hands free of it, saying you don't have our authorization to do this, and everybody was stunned, and after that point the damages ensued.

(10/29/2014 Oral Argument Transcript at 38:24-39:11, ECF No. 68 at 38-39).

12cv1291 WQH (DHB)

> Antwerp.  To prevent consumers from experiencing confusion or making incorrect assumptions, we respectfully request that future press releases do not mention GIA as regards grading services.  We appreciate your understanding in this manner.

(SAC Ex. 9 at 271, ECF No. 29-4 at 66).

The 2007 and 2009 Licencing Agreements specifically preclude GIA Italy from opening a gem grading lab or performing GIA gem grading services without prior written consent. *See supra* note 11.  The Court concludes that, at the time of the alleged breach, Defendant had no obligation to aid GIA Italy in opening a gem grading lab, drop-off location, or take-in window or authorize GIA Italy to perform GIA gem grading services.

### iii.  Damages

Even assuming that Defendant GIA had an obligation in 2011 to authorize GIA Italy to perform GIA gem grading or to aid GIA Italy in opening a gem grading lab, take-in window, or drop-off location, and assuming that GIA Italy was an intended beneficiary of the Firgem Agreement, the Court finds that GIA Italy has failed to meet its summary judgment burden to come forward with evidence demonstrating its damages.

The only evidence of damages offered by GIA Italy is the following testimony of Frederick Stocco:

> In 2005, when GIA headquarters signed the FIRGEM contract, part of the obligations of the contract were to transfer the school from Vicenza to Florence.  There was nothing in Florence for us, so we were shown a building in Florence, in the center, that the Chamber said that "We will pay the rent and the expenses, but you would have to build out the school" because it was two floors of open space.
>
> So we took out loans – I'll use dollar terms, we took out loans on behalf of GIA HQ.  GIA Florence at the time took out loans of about $600,000 to build the school out.  This was – we were told – we were ordered by GIA to do so.  This is 2005.

(F. Stocco 30(b)(6) Dep. at 27:24-28:13, ECF No. 48-8 at 6-7).  As discussed above, the 2007 and 2009 Licensing Agreements precluded GIA Italy from operating GIA gem grading services or opening a gem grading lab without Defendant GIA's prior written consent.  Any request from Defendant for GIA Italy to incur debt to build a school does

not operate as "prior written consent" to open up a gem grading lab, as required by the 2009 Licensing Agreement.  (SAC Ex. 7 at 211, ECF No. 29-4 at 6).  Absent evidence of a breach of contract, GIA Italy cannot recover damages resulting from the debt it incurred in building a school.

### iv.  Conclusion

Defendant's motion for summary judgment on GIA Italy's breach of contract claim is granted on the following grounds: (1) GIA Italy was not an intended beneficiary of the Firgem Agreement; (2) GIA Italy was expressly precluded from opening a gem grading lab or performing GIA gem grading services at the time of the alleged breach by the 2009 Licensing Agreement; and (3) GIA Italy has failed to demonstrate it was damaged as a result of a breach of contract because it has failed to raise a triable issue of fact that a breach of contract occurred.

## IV.  Conclusion

IT IS HEREBY ORDERED that Defendant Gemological Institute of America's Motion for Summary Judgment (ECF No. 46) is GRANTED.

DATED:  February 5, 2015

*William Q. Hayes*

**WILLIAM Q. HAYES**
United States District Judge